**GARY A. FARRELL**
ATTORNEY AT LAW
**40 EXCHANGE PLACE**
**SUITE 1800**
**NEW YORK, NEW YORK 10005**

Telephone (212) 822-1434
Fax (212) 482-1303
GaryFesq@aol.com
Garyfarrelllaw.com

June 21, 2023

Hon. Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza
Brooklyn, New York 11201
Via ECF redacted and original via hand delivery

                                      RE: USA v. John Porcello
                                      Docket # 22-CR-0029 (KAM)
                                      Sentence date 7/13/23 11a.m.

Dear Judge Matsumoto:

      As the Court knows, this defendant was convicted after a guilty plea to the first count in the indictment, Extortionate Extension of Credit Conspiracy, 18 U.S.C.§ 892(a). Sentencing is currently scheduled for July 13, 2023, at 11:00 a.m. This letter is written pursuant to Rule 32 of the FRCP to advise the Court of several matters that the defendant will raise at the time of sentencing and to aid in the determination of an appropriate sentence.

      **I.**     **The Presentence Report**

      The defense has only one objection/correction to note.[1] PSR ¶ 115 states that an Accurint database search revealed that, "the defendant and fiancé are co-owners of the address of record purchased on January 20, 2021, for $540,070." In reality, the condominium is jointly owned by the the defendant's son, John Porcello, Jr., and the defendant's fiancé, Tia Montemurro. The defendant himself does not hold an ownership interest in the property. The likely cause of this confusion is that John Porcello, Jr. does not use the "junior" designation on his driver's license (see enclosed documents as Exhibit A).[2] This notwithstanding, the defendant does often stay at the condominium with his fiancé, Tia Montemurro, while also spending some nights at this mother's rented house in the Bronx.

      This same paragraph of the PSR notes that, "the defendant, along with his siblings, are listed as owners or former owners of 2030 Continental Avenue, Bronx, New York; 726 Revere Avenue, Bronx New York; and 10 Mallow Street, Staten Island, New York." The defendant is not a present owner of any of these properties: the Continental Avenue home in the Bronx was

---

[1] The defense apologizes to Probation and the Court for not noticing this factual error until very recently.
[2] These records were obtained from Record and Return, the title insurance company that handled the closing and they show that the purchaser John Porcello has a different social security number than the defendant. PSR at. 2.

owned by his parents and was sold to his sister and brother-in-law who in turn sold it as they now live in New Jersey. The Revere Avenue home was owned by the defendant and his brother but was sold more than twenty years ago; and the Mallow Street home was given to the defendant's first ex-wife as part of the divorce settlement in 2004 (PSR ¶ 92). Finally, this paragraph lists several vehicles which the defendant previously owned or leased. He currently has no ownership interest in any of these vehicles.

The defense reaffirms its stipulation to the guidelines calculation as set forth in the plea agreement, which are reiterated in the PSR, namely a total offense level of 24, with a criminal history category of II, resulting a guideline imprisonment range of 57 months to 71 months. PSR ¶ 120.

## II.     18 U.S.C. § 3553(a)

### 1.     The History and Characteristics of the Defendant

#### A.     The Defendant's Personal and Family Background

John Porcello is 61 years old and as noted in the PSR, was raised in the Bronx by his parents and grew up in an intact household with his younger brother and older sister. PSR ¶ 90. Sadly, John's father suffered from a serious heart condition that caused him to stop working at 33 and ultimately caused him to die at 55. PSR ¶ 90. The Porcello family struggled financially due to John's father's disability. PSR ¶ 90.

John left junior high school and went to "the streets" where he committed multiple crimes as a young man, sometimes while under the influence of cocaine. PSR ¶s 77-82, 105. After being released to parole in 1986 he lived a law-abiding life and was discharged from parole without any violations. PSR ¶ 80. John then married Claire Galenordo in 1987 and their union produced four children: their oldest son Joseph, daugther Kristina (a twin with Joseph), and twin sons Nicholas and John. PSR ¶ 92. Although their divorce was finalized in 2004, Claire nonetheless wrote a letter of support for John noting his devotion to his children:

> There have been stumbling blocks over the years. With young children going through a divorce, it was not easy. One thing remained persistent, we always managed to make it work no matter what to put our children first. John was always there no matter what to pick up the kids and take them back to the Bronx from Staten Island. John will continue to be the best father he can be no matter the circumstances. Exhibit B.

John had difficulty in his second marriage also. This union produced the couple's only child, ███████████, now 16 years old, PSR ¶ 93, and the couple divorced in 2014. While and the joint custody issue, which was worked out so amiably with respect to John's first marriage was hard fought in this instance. Sadly, this had the effect of John being forced into supervised parental visitation during litigation, which he felt to be profoundly unfair to himself and to his son. PSR ¶ 93. John continues to honor his monthly financial obligations and very much hopes to re-connect with his son when he turns eighteen. PSR ¶ 93.

Just prior to his second marriage ending, in 2013, just after serving a sentence on a federal case imposed by this Court, John suffered through the worst tragedy a parent can imagine: his oldest son, Nicholas, fatally overdosed on opiates at just 22 years old. PSR ¶ 92. This devasted John and most assuredly played a part in the bad choices he would make in the coming years. As his sister-in-law Gina Porcello noted in her letter to the Court, "[t]ragically John lost a son at a young age and [he] was obviously devastated and will never be the same: he lost a piece of his heart that can never be filled." Exhibit C.

John's nephew, Joey Porcello, a union electrician, likewise vividly described the immediate effects of John's son death on him and his parents and grandmother:

> I'll never forget when my father got a call, it was my uncle, somehow driving home from the Hamptons telling him his son[,] also "Joey Porcello"[,] has died. This was one of the most traumatic moments of my life, the screams from my mother were unbearable and my entire body was in shock. I remember that day like it was yesterday, my hands shaking trying to hug my grandmother. It is just something that will be a scar in my memory that I will never forget. Exhibit C.

Although John Porcello has made many mistakes in his life, he counts himself lucky to have a loving family who continues to support him. Despite his own mistakes in judgment, including the acts that have caused him to once again be before this Court for sentence, John's family, both nuclear and extended, paid heartfelt tribute to his loving, compassionate and helping nature which was often displayed towards his family, in their letters to the Court.

John's 81-year-old mother Clorinda Porcello wrote to the Court and described the love she feels towards her son, and how, as her health continues to fail, he has been the rock she has leaned on for support:

> I am 81 years old and not in the best of health. I am blessed to have John take care of me with doctor's appointments, food shopping weekly, laundry twice a week, my pills, my three-month hearing aid tests. I lived with him for 7 years which he was there all the time, but he now lives 15 minutes away with his fiancé Tia. I depend solely on him because my other two children live far away. . . He is very family oriented, sensitive, lovable and caring and adoring his grandchildren. He babysits 2 days a week in Staten Island, he is busy with me taking care of what I need and is with his fiancé the other days. Exhibit D.

John's brother, Joseph Porcello, who owns and operates an Elevator Inspection Company, corroborated John's role as a caregiver to their mother:

> Our dad died at a young age and stepped up as the father figure in our family in every way possible. He has been there for all of us but more specifically, he has been there for our mother since our father died to this very day. . . He takes her to the doctors appointments, food shopping etc. and is always spending time with

3

her. . . Sometimes, just sitting and watching movies together.  I am grateful to John for being there for mom and taking on that role.   Exhibit D.

John's daughter Kristina Alviera, a special needs teacher for the Department of Education, wrote lovingly about her father and stressed the important role he plays in her family with respect to her son and daughter:

My children look up to my father tremendously, and they look forward to the days he comes to stay over.  My daughter constantly needs help with her math, and she knows how smart her grandpa is in math. . .  As for my son ▮▮▮, he is the apple of my father's eye.  My dad always says that my son ▮▮▮ reminds me a lot of himself.  He looks forward to teaching him how to be successful in sports, and hopes to pass on his athletic abilities. . . My father suffers from heart disease, heart palpitations, and anxiety.  He's undergone multiple back surgeries and continues to suffer from chronic pain.  Even with his medical conditions, my father never misses time with his grandchildren.  Exhibit E.

John's twin sons, Nicholas and John, Jr., who co-own a financial business, both likewise praised their father, with John Jr. noting that their father "taught us the true meaning of hard work, the importance of humility and the significance of family."   Exhibit F.  Nicholas credits his father with instilling in him a sense of charity and community:

I currently volunteer for an organization that provides warm clothing and durable boots for homeless veterans.   I donate clothing, both used and new to various shelters in my community.  I also drive around with a trunk filled with jackets that I purchased from a Walmart a few months ago; I usually stop my car randomly and hand out these to people who I think would find peace in a warm coat on a cold night. . . I was raised to work hard for what you have, always remember where you come from, and never forget about those in need.  My morality as a man is all owed to my father.  Exhibit F.

 John's first cousin, Salvatore LaMorte, a Healthcare Industry Executive, added to the chorus of relatives who views John as a giving family man, and he urged the court to impose a lenient sentence:

I have always known John as a very compassionate, unselfish person who always was helping others and giving.  He is a loving and caring Father and Grandfather ad absolutely adores his children and grandchildren.  He is a very big part of his grandchildren's lives on a daily basis and has a very strong bonding relationship with them and is critical in their lives today.  Please be passionate and understanding when making your decision because the world would be a much better place with John home ASAP to support his family.  Exhibit G.

There is no question that John Porcello's life changed for the better when he began dating Tia Maria Montemurro in 2019.  Ms. Montemurro is a successful entrepreneur and she and her family have real estate holdings in New York City which she manages.  PSR ¶ 94.  Many of

4

John's friends and relatives pointed out the overwhelmingly positive change Tia has brought to John's life. Like John, Tia also lost a son to a drug overdose. His cousin Lorraine Firnero, a retired freight airline manager, eloquently described their relationship and the changes she has witnessed to John:

> As time stands still for no one, john got older and wiser while dealing with several health issues for himself. It was during this time John met a wonderful girl and fell in love. Tia is a strong woman herself having lost a son to drugs as well. They make a great couple, and Tia is responsible for John having turned his life around. She is a business woman with very strong convictions. John spends time with her in her boutique in Rockland County, is very involved with her Toys for Tots charity and has become friends with her business associates and very reputable personal friends. . . Tia embraced his children and grandchildren and always made sure to include his ex-wife in their outings. This is so beautiful to see and John is so very happy. Exhibit H.

Ms. Montemurro was the person that John gave to verify his information for the creation of the PSR. Although she praised his positive qualities, she was adamant that she "will not tolerate his involvement in illicit activities." PSR ¶ 95. Ms. Montemurro re-affirmed this commitment to the Court wherein she also noted the special bond she and John share due to the loss of their sons—who were the same age and who died the same year:

> Unfortunately, John and I share the same loss of both of our sons—losing both our sons at the age of 22—6 months apart to the drug addiction epidemic. We share a bond like no other—I truly believe in my heart that our sons brought us together. . . I write this to you because when I first met John in November of 2019- I was unaware of his criminal past or present. . . After John's arrest I did some research on him on the internet and found some things about his past I did not like. . . or that I would accept in my life or my children. . . John had a big decision to make about our future together. John chose to lead a different life since then. John now has a different group of guy friends who are the husbands of my girlfriends. All my friends know that I will not allow John to hang out with anyone that does not have a W2 or a K1 or if they have a criminal past—I make 100% sure of that. . . To sum it up, at times I feel like that John came into my life so I can show him a different way of living—the way my parents taught me to obey the law. Exhibit I (also contains a letter of support from Ms. Montemurro's daughter, Tatiana).

Several of Ms. Montemurro's friends also wrote letters of support for John Porcello. Karen Eastling-Ferriello, a mental health worker currently enrolled in the Accelerated Nursing Program at Pace University, who also wrote on behalf of her husband, Louis Ferriello, who has had a successful career in finance, pointed out a number of the defendant's attributes, specifically his empathy and compassion for their teenage autistic son, ▇▇▇▇ :

> John and I often share conversations regarding our children. Despite him not being an "Autism" or "Special Needs" parent, he understands the struggles I face

5

having a child with autism.  John has truly given me sound advice and always reassures me of the talents and gifts ▮▮▮ possesses.  My husband and I are completely aware of the guilty plea John has entered.  Upon his release I have no doubt John will return as a productive member of society.  From my years spent working with clients released from incarceration, I am aware of the transitional component that takes place in becoming a law-abiding citizen. . . Fortunately, my work within the mental health and substance abuse field has afforded me the knowledge of incorporating and embracing the whole-person centered approach.  This model educates on the many layers that make up the whole individual and not just a piece of who they are.  The layers I have witnessed in John are those of generosity, empathy, understanding and caring.  That is the John Porcello we have seen and the one my son, ▮▮▮ adores.  Your honor, I ask you to please consider the positive layers of John when determining his sentence.  Exhibit J.

Ms. Montemurro's friend, Nico Hawkeye, a Native American tribal leader and owner of the technology consulting firm, Hawkeye Global, wrote a moving letter to the Court praising the transformation of his new "best friend" John Porcello:

He has the heart and soul, and he has already changed full circle.  He wants no part of that former life.  He needed Tia and I to be strong enough to help him see that good, honest life and how beautiful it is versus the life he was born into.  John has already changed his life.  I am living proof and I want to share this with you. . . He tells us every day how grateful he is that we both not only helped him to see the light but we brought him into the light.  Tia and I will keep him there.  That won't be hard.  He truly wants to stay in the light on his now.  He is 100% committed to it whether Tia and I are there or not.  He never wants to go back to that life.  He won't I know it.   Exhibit K.

Finally, Stephanie Caban and Daniel Williams, "devoted Christians" and owners of the gymnasium, Level Up Fit Lab Inc., wrote a lengthy letter addressing the good qualities they have observed in John Porcello and how the unlikely pairing of John and Tia works so well:

Listening to them share their life stories, you'll realize that despite their glaring differences, they share similar up bringing, traumatic experiences, and even similar bad decisions.  They share a love of God, and a desire to be a better version of themselves.  They both share a love for people and giving of themselves makes them fulfilled.  Exhibit L.

Stephanie also recounted the very painful experience of her father's heart attack, and she described how John Porcello was able to comfort her and her father:

He's done so much more, but one thing that leaves an imprint in my heart was the day my father suffered a heart attack and was admitted to the hospital.  My father had to get surgery and had 4 stents put in.  I'm usually the strong one in my family.  I sometimes forgot to acknowledge my own feelings.  That day, Johnny came to the hospital.  He took one look at me trying to be strong for everyone else

and, he comforted and create a safe place for me to cry. He shared with me his personal experience when he had to have stents put in his heart. Johnny even took the time to speak to my father about his personal experience to bring comfort to my dad. I could tell that my father's anxiety was so much better after speaking to Johnny. Exhibit L.

### B. Education and Employment Background

Mr. Hawkeye acknowledged in his letter to the Court, John Porcello has "no formal education." John freely admits that he "stupidly" left junior high school to get involved in drug use and committing street crimes. PSR ¶ 108. To his credit, he received a GED while serving a state prison sentence back in 1984. PSR ¶ 107.

After being released from prison in the late 1980s and being newly married and his wife pregnant with twins, John took any job he could get. His first wife noted how he drove a milk truck to support them when she became pregnant with her first set of twins (Exhibit B). It was in 1990 that John found his professional calling (and ultimately his nickname) when he began working in the pizzeria business with his brother-in-law. PSR ¶ 110-111. It is worth noting that he was not given ownership of the business purely by dint of his familial relationship to the owner. Rather, his father-in-law insisted that he first prove himself worthy by coming in for three days a week for six months to learn the business while still driving a milk truck at night.

John passed this audition with flying colors and for the next 18 years John Porcello worked many, many long hours at pizzerias, first in Manhattan with his brothers-in-law and then after his divorce, in the Bronx. His typical work week was six days, though seven-day work weeks were not uncommon. John would get in by 10 a.m. and start making pizzas and doing everything else necessary to prepare for the lunch rush in midtown. He would often stay until 8 p.m. or later and hope to catch the express bus home.

These long hours and physical work took their toll on John and by 2000 he suffered his first heat attack and had his first stent put in. PSR ¶ 99. He also began to feel significant discomfort in his back which only got worse as the years went on. By 2010, he had a surgical fusion procedure on his back. PSR ¶ 98, Exhibit M).

### C. John Porcello's Medical Conditions

It took one and one-third pages of the PSR to describe the various medical conditions that John suffers from. PSR ¶ 98-103. The PSR confirmed John's history of back issues, noted the surgeries, the pain management treatments and that this condition continues to this day. PSR ¶s 98-100, 101. The enclosed radiologist's report shows that John suffers from "severe" spinal stenosis and several herniated discs. PSR ¶ 102, Exhibit N. Additionally, he underwent a total right hip replacement less than two years ago and his left hip was seen to have "mild degenerative changes and marginal spurs." Exhibit O. John also suffers from high blood pressure, high cholesterol, and gastroesophageal reflux disease for which he prescribed medications. PSR ¶ 99.

The most serious condition plaguing the defendant is his history of coronary artery disease which caused him to have stents implanted on three different occasions. PSR ¶s 102-103. This same disease cut short his father's life at 55. PSR ¶ 90. His cardiologist, Dr. Saponieri, opined that John must avoid "any form of physical and emotional stress including heavy lifting that could deteriorate his condition." PSR ¶ 103. Although he will not be subjected to heavy lifting while in BOP custody, there is no shortage of emotional stress to be had during the period of his incarceration.

### D. John Porcello has Satisfied the Entire $125,000 Forfeiture Order

As the Court now knows, the defendant has fully satisfied the $125,000 forfeiture order (Docket #45). The defense submits that this is a factor the Court may consider when determining the appropriate sentence to impose.

In United States v. Kim, 364 F.3d 1235, 1238 (11th Cir. 2004), the Court upheld the district court's downward departure based upon the fact that the defendants paid the full restitution of $268,237.03 prior to sentence. The Court relied on the fact that the defendants extended themselves by putting up their life savings of $50,000 and borrowing the remaining money needed to get everything paid in full by the sentence date. 364 F.3d at 1238-1239. John Porcello was able to pay the full forfeiture order of $125,000 only through the financial support of his family.

In United States v. Miller, 991 F.2d 552 (9th Cir. 1993), the Court upheld the district court's downward departure based upon extraordinary efforts at restitution. The Court adopted the district court's rationale which it quoted as follows:

> The defendant and her family have had to obtain a substantial loan on the family home as a result of and in order to pay restitution. The family is now in the process of selling that home in order to repay the loan that has been taken into account. I believe that the extraordinary nature of the restitution, the prompt efforts by the defendant to make the restitution, the ultimate payment of over $58,000 justify a reduction in the points that would be applicable under the guideline range sufficient so that we would reach a level where probation would be appropriate.

991 F.2d at 557-558. See also United States v. Davis, 797 F. Supp. 672 (Northern Dist. of Indiana) (1992) (the district court departed eight levels due to the extraordinary pre-sentence payment of restitution, namely $775,000 of the $800,000 due).

Based upon the rationale of the above cases, this Court can find that the defendant's act of paying off the full forfeiture order in advance of sentence qualifies as extraordinary acceptance of responsibility. The Government may argue that no credit should be given for doing what the law requires. However, this argument fails to take into account that it is a miniscule number of forfeiture and restitution orders that are ever fully satisfied, much less fully satisfied before sentence is imposed. The defense respectfully requests that this be taken into consideration by the Court when it determines the appropriate sentence to impose in this case.

In sum, although John Porcello has made significant errors in judgment during the course of his life, the overall aspect of his character which is centered around his family, and the demonstrable changes in his behavior since his arrest, militate towards a downward variance.

### 2. The Need for the Sentence Imposed

There are several additional factors listed under 18 U.S.C. § 3553(a) (2) that the Court must consider in order to "impose a sentence sufficient, but not greater than necessary to comply with the purposes of sentencing." Some of these factors have already been addressed and the defense will seek to address the remaining ones in combination with each other.

### 3. Seriousness of the Offense, Respect for the Law, and Just Punishment

The offense of conspiring to extend extortionate credit extensions is serious, especially for this defendant who was previously convicted of this same offense before this Court approximately ten years ago. PSR ¶ 84. Although none of the defendant's transgressions in this case consisted of any acts of violence or plausible threats of violence, it is nonetheless a serious offense wherein degenerate gamblers are subjected to paying usurious interest rates for loans to repay gambling debts for fear that harm will come to them if they fail to pay.[3] These borrowers were often gambling with the proceeds of ill-gotten gains.[4] It often became a vicious cycle from which they had difficulty escaping. John Porcello has taken full responsibility for his actions by pleading guilty in a timely manner and paying off the forfeiture judgment in full reflecting the profits from these illegal acts. PSR ¶s 73-74.

### 4. Deterrence and the Protection of the Public

There is no reason to believe that John Porcello will commit any further crimes. In the nearly eighteen months since his arrest, Mr. Porcello, "has complied with all Court-Ordered conditions of release." PSR ¶ 4. As noted above, John Porcello has changed his lifestyle since his arrest and spends his time with his immediate family, and his fiancé and her friends and family, as opposed to associates of organized crime whose income is derived from illegal bookmaking and loansharking. Finally, after serving any sentence imposed by the Court, John Porcello will be on supervised release for a period of years where he has a record of complying with all conditions of his release and leading a law-abiding life. PSR ¶ 84. This includes his time on state parole back in the 1980s. PSR ¶ 80. Any sentence of incarceration will be more than enough to specifically deter John Porcello from committing any further crimes as he realizes his age and his health issues will severely compromise his chances of surviving a future prison term.

As to general deterrence, the landscape for gambling in the United States has profoundly changed in recent years. Up until just a few years ago, legal sports betting was limited only to sportsbooks in Las Vegas and then Atlantic City casinos. This provided vast openings for illegal sports betting operations to flourish everywhere else, including New York City. Today 33 states and the District of Columbia offer legal sports betting with four more states very close

---

[3] AUSA Gibaldi notified the defense that "Victim 3" made it clear that he did not believe that John Porcello would ever physically harm him if he failed to repay him but that he would harm his reputation. Exhibit P.
[4] Investigation has revealed that one victim, Leonel Brazoban, was sentenced last month by Judge Gujarati to 60 months in prison for Conspiring to Distribute Methamphetamine, 22-CR-41 (DG).

9

to passing laws.[5] Mobile sports betting in New York generated 16.5 billion dollars in revenue. This does not mean illegal sports betting run by organized crime, and the complimentary loansharking that accompanies it, has or will disappear; however, it certainly appears to be less prevalent with the advent of legal mobile sports betting.

### 5. A Sentence Which Contains a Substantial Downward Variance Will Not Result in Unwarranted Sentencing Disparities

In a recent extortion case in the Southern District of New York with more egregious facts, three of the four defendants who pled guilty before trial received below-guideline range sentences. The defendants in *United States v. Vincent Esposito, et. al*., 18-cr-00014-VM (S.D.N.Y), were members of the La Cosa Nostra, Genovese Crime Family, who collectively extorted hundreds of thousands of dollars' worth of payment from a local labor union. *Id*. (ECF No. 285), Gov't Sentencing Submission, September 30, 2019. The largest downward variance among the guilty pleading defendants was granted to Steven Arena a/k/a "Mad Dog," *id*. who, at age 65 at the time of sentencing, id. (ECF No. 284), Defendant Sentencing Submission, September 27, 2019, was the closest in age to John Porcello here, at age 61. Arena had no legitimate position or relationship with the labor union at issue, and yet was able to extract $276,500 from the union and its members. *Id*. (ECF No. 285) at 4. As such, his stipulated plea agreement guideline range was 27 to 33 months. *Id*. at 2. Yet, due to his health conditions, the parties agreed, and the court sentenced him to only 366 days incarceration, (followed by 3 years supervised release and amount of $276,500 forfeiture.) *Id*. (ECF No. 315) Judgement, November 15, 2019. According to his sentencing submission, Arena suffered from COPD, requiring his use of a CPAP machine to sleep and, and required medications usually prescribed for conditions such as coronary heart disease, high blood sugar, hyperlipidemia, and high blood pressure. *Id*. (ECF No. 284) at 3. Like the health conditions John Porcello suffers from, they are significantly debilitating, and if not properly treated, could most certainly prove fatal.

Defendant Vincent D'Acunto, 51, from the same indictment also received a downward variance at least in part based on health reasons as he suffers from chronic kidney disease, *id*. (ECF No. 242), Defendant Sentencing Submission, was sentenced to 10 months incarceration and 3 years supervised release, Id. (ECF No. 256) Judgement, August 9, 2019, below his guideline range of 12 to 18 months. Id. (ECF No. 252) Gov't Sentencing Submission, August 2, 2019. Although not disclosed in public filings, Vincent Esposito's health conditions were taken under consideration when sentenced to 24 months incarceration, at the bottom of his guideline range of 24 to 30 months. Id. (ECF No. 264), Sentencing Transcript, at 40-41. Finally, Frank Cognetta, whose health issues were also redacted from public filings, was sentenced to 24 months incarceration, while his guideline range was 33-41 months. Id. (ECF 287) Sentencing Transcript at 27.

Greater still, was the downward variance granted to co-defendant Frank Giovinco, who was sentenced to 48 months' incarceration following a RICO conviction after trial, *id*. (ECF No. 281), Judgement, September 11, 2019, despite a Probation Department calculated guideline range of 108 to 135 months. *Id*. (ECF No. 372), Defendant's Sentencing Submission, June 15, 2020, 5. For that 53-year-old, *id*. (ECF No. 371), Gov't Sentencing Submission, June 15, 2020,

---

[5] "First Comes the Sports Betting Boom. Now Comes the Backlash." The New York Times, 5/13/23, attached as Exhibit Q.

10

3, who was "in generally good health," *id.* (ECF No. 372) at 4, the court went even below the Probation Department's recommendation for a downward variance of 60 months, made based on his familial financial responsibilities, *Id.* at 6.[6]

### III.    Recommendation

This Court is well aware that the Supreme Court and the Second Circuit have held that, "a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008); see also Gall v. United States, 128 S. Ct. 586 (2007); Kimbrough v. United States, 128 S. Ct. 558; Rita v. United States, 551 U.S. 338 (2007).  When arriving at the proper sentence the court may not presume the Guidelines sentence is reasonable, but "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." Cavera, 550 F.3d at 189.

Based upon a balancing all of the above factors, we are asking the Court to grant a significant downward variance from the guidelines calculation that would spare the defendant a lengthy prison term and allow him to return to his loving family where he provides significant emotional support, especially to his elderly and infirm mother, Clorinda.  Finally, we are requesting that the defendant be allowed to self-surrender based upon his exemplary performance while under PTS supervision.

Sincerely,

Gary Farrell
Attorney for John Porcello

cc:  AUSA Michael Gibaldi (via email and ECF)
     Probation Officer Steven Guttman (via email)

---

[6] The sentencing minutes for this case were not readily available on Pacer therefore Judge Rakoff's reasoning cannot be discerned for giving this defendant a significant downward variance.

11